AUGUSTA MERKLE, ADMINISTRATRIX OF THE ESTATE OF GEORGE MERKLE, DECEASED, v. THE TOWNSHIP OF BENNINGTON.

[See 58 Mich. 156.]

*Negligence—Injury from defective bridge—Evidence—Pleading—Variance—Charge to jury—Executors and administrators—Repeal of statute.*

1. A repealing statute, without a saving clause, which substantially re-enacts the law repealed, will not affect pending suits.[1]

2. The object of a pleading is to apprise the court and opposite party of the pleader's claim. Certainty to a *common* intent is all that is required in the declaration, and this is attained, in actions of trespass on the case for negligence, when the neglect of duty relied on, and resultant injury, are described with *substantial* accuracy.

So *held*, where the declaration alleged, as the cause of the injury, the defective condition of a bridge, in that the planks were loose and the stringers uneven, whereby the planks were liable to slip off, turn over, and tip up, and thereby trip horses, and that plaintiff's horse became entangled in the loose planks, and thereby tripped, etc.; while the proofs tended to show that there was a *broken* plank, and a hole in consequence thereof, into which the off horse stepped, and then stumbled or jumped, causing the wagon tongue to fall, etc., and hence the injury.

3. Where, on the introduction of evidence of the *cause* of the injury complained of in an action for negligence, no objection was raised on account of variance from the *case* alleged in the declaration, such objection made by a motion in arrest of judgment

---

[1]See *Moore v. Township of Kenockee*, 75 Mich. 332.

ought to be disregarded, unless the variance is substantial, and, if so, the declaration should be treated as amended to meet the proofs made.

4. The alleged refusal to give certain requests to charge, which the circuit judge certifies were not presented to him to his recollection, cannot be assigned as error.

5. In a suit involving the condition of a bridge at time of an accident alleged to have happened by reason of its non-repair, testimony by one witness that "it was a very poor, shackly bridge," and by another that "from his personal knowledge the bridge was in good repair," is admissible.

6. Where, after the testimony of a witness that a bridge, claimed to be out of repair, was to his *personal* knowledge in good repair, was striken out as incompetent, he was permitted to state fully its condition, from which it appeared, if he was believed, that the bridge *was* in good repair, the rejection of his first statement is error without prejudice.

7. Where no reason is stated for an objection to testimony, the appellate court cannot say that the trial court erred in overruling it.

8. Where, under the testimony in a case, it is a disputed question whether, for a long time prior to the accident complained of, a bridge had been out of repair 'at the *place* where the accident occurred, it is proper for the court to direct the attention of the jury to the *precise place* in controversy, and to the disputed question whether *it* had been repaired.

9. The liability created by the statute for negligence resulting in the death of the injured party is a chose in action and assets belonging to the personal representative; and if the executor refuses to enforce collection, and secures his discharge, the probate court may appoint a successor to complete the administration of the estate, under How. Stat. § 5843.

Error to Shiawassee. (Newton, J.) Argued October 4, 1887. Decided January 12, 1888.

Case for injuries received on account of non-repair of bridge. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Isaac Marston* (*S. F. Smith*, of counsel), for appellant.

*G. R. Lyon* and *Hugh McCurdy*, for plaintiff.

CHAMPLIN, J.   When this case was heard, the Court called attention of counsel to the repeal of the statute, contained in Act No. 264, Laws of 1887, under which the action in this case was planted.   The repeal is in express terms, and without any saving clause.   Supplemental briefs have been furnished us upon this point.   The repealing statute, however, substantially re-enacts the law repealed, with some slight modifications so as to include in the remedy afforded by its provisions damages for injuries received in consequence of the neglect of municipal corporations to keep sidewalks in repair, and to abolish the common-law liability to actions for negligence against such corporations.   Upon consideration of the matter, we have concluded that the plaintiff's right of action is not affected by the act of 1887.

The injury for which the plaintiff seeks a recovery occurred July 5, 1881.

The declaration contains two counts.

The first alleges that a bridge had been constructed across Maple river, of timber and planks, laid upon stringers, in the usual manner of building bridges, and was built by the township for the purpose of being used as a bridge by the public traveling along the highway.

That it was the duty of defendant to keep the highway and bridge in good repair, and in a safe and convenient condition for public travel at all times.

That it did not keep the bridge in good repair, but suffered the same to become dangerous, and unfit for public use and travel,—

"Said planks being loose, never having been fastened to said stringers, and the stringers uneven, so that said planks became and were liable to slip off of said stringers, turn over, and tip up, and trip horses, and make them stumble, and obstruct wagons and vehicles when passing over said bridge; and said plank did slip off the stringers, became displaced, and did tip up, and trip horses, and obstruct wagons and vehicles while passing over said bridge."

The declaration then charges that while George Merkle was driving over this bridge in a careful and prudent manner, and without fault on his part,—

" The said horses which he was driving became entangled in the loose planks of said bridge, and thereby tripped, stumbled, and became frightened and unmanageable, and ran away, and threw the said George Merkle out of the wagon."

The second count charges that the bridge was dangerous, and unfit for public travel and use,—

" The planks on the bridge loose, and were liable to slip off the stringers, topple, and tip up, and trip horses and obstruct wagons, and said planks did topple, slip off the stringers, become displaced, and did tip up, and trip horses and obstruct wagons in crossing said bridge."

That as said George Merkle was riding in his wagon, and driving his horses and wagon over said bridge in a careful and prudent manner, and without his fault, his horses became entangled in the loose planks of said bridge, and thereby tripped, stumbled, and became frightened and unmanageable, and ran away, thereby throwing said George Merkle out of his wagon upon a pile of stones by said public highway, whereby he was injured so that he died.

The defense was the general issue.

The cause was tried before a jury, who gave a verdict for the plaintiff.

The defendant submitted four special questions to the jury, which, with their answers thereto, were as follows:

"Q. Did Mr. Fisher, as overseer of highways in the district where this bridge was situated, repair the same in a proper manner, between the twentieth and thirtieth days of June, 1881?

"A. No.

"Q. Was the fact that one of Mr. Merkle's horses stepped into a hole in the bridge, as testified to by Anna Merkle, the direct cause of the injury?

"A. Yes.

" *Q.* Did Mr. Merkle see this hole on his way to Owosso that morning and consider it dangerous?

" A. Yes.

" *Q.* Could Mr. Merkle, on his way back, by the use of ordinary care in driving on the east side of the bridge, have passed over the same with safety?

" *A.* No."

Anna Merkle, referred to in the second special question, is the daughter of George Merkle, who was injured by the accident, and is the only living witness who was present when it occurred. She testified respecting it as follows:

" We were coming from Owosso. We drove over the bridge to this plank, and the horse got scared, acted as though he got caught in the plank, and gave an awful jerk, and I heard something break and something fall onto the bridge. The wagon run on the west side, down this bank, and threw my father out onto a pile of stones, and I jumped out and the horses got away.

" *Q.* Did you see, then, anything in relation to the situa-ation of the planks on the bridge?

" *A.* Yes, sir.

" *Q.* When the horses went upon them, how were they, as to rattling?

" *A.* They rattled.

" *Q.* As the horses walked over them, they rattled as they walked?

" *A.* Yes, sir.

" *Q.* Now, you stated to the jury that when they came to this plank; what do you mean by that?

" *A.* That was the plank where the horse acted as though he got caught. I turned around to see what was the matter, and the plank, it was slipped out from the west end of the bridge, west side rather, and it left a hole, and it looked as though it was cut cornerwise, angling of the board; it looked as though it was slipped back over the other one.

" *Q.* That was where the difficulty occurred?

" *A.* Yes, sir; that was the difficulty in the bridge; yes, sir.

" *Q.* Where the difficulty occurred with the horse?

" *A.* Yes, sir.

" *Q.* How did the horse jump; suddenly?

" *A.* Yes, sir; he acted as though he got caught pretty tight.

"*Q.* What did your father do then; when the horse jumped, what did he do?

"*A.* He looked over the dash-board to see what was the matter. He didn't say anything.

"*Q.* What did he do with reference to trying to hold them?

"*A.* He had hold of the lines and pulled them back with all his might, but it seems as though he could not manage them.

"*Q.* State to the jury just how the horses acted there? Did they at once jump into a run?

"*A.* No, sir, the off horse, that is the horse on the west side, gave an awful jerk as though he was caught, and then they tried to get away from the wagon; they jerked and pulled, but didn't get away from the wagon on the bridge.

"*Q.* As you recollect it, when did the horses finally get loose from the wagon?

"*A.* After they had gone down the bank and threw my father out. I jumped out. I fell. As I got up, the first thing I saw was the horses just turning, I guess it is what you call the turnpike."

On her cross-examination, she testified that on the way going to Owosso with her father, in the morning, she did not notice anything on approaching the bridge; that she did while crossing; that her father said there might be an accident happen there sometime. He was looking to the west side of the bridge. It attracted her attention, and she saw there was a plank bowing up on the west end.

"*Q.* Was it a plank bowing up, or was there a hole?

"*A.* I didn't notice a hole. I didn't notice at that time. I noticed the plank being bowed up.

"*Q.* Didn't your father make the remark that there was a hole there, and somebody might get injured?

"*A.* No, sir; he simply said there might an accident happen there sometime."

The witness was then cross-examined as to the testimony given upon a former trial of the case, from which it appeared that she testified that when going north with her father towards Owosso, that morning, she observed a broken plank that was loose between the south end and middle of the

bridge, on the west side, which was the place where the plank flew up when they came back; that it was broken from the corner crosswise; there was a piece broken angling off the end, and there was a hole there.

"*Q.* Which side of the bridge did your father drive upon on his way back; the east or west side?

"*A.* I don't know; I guess he drove through the center of the bridge.

"*Q* Don't you remember he drove on the west side, so the horse got his foot caught in that hole, the hole being on the west side?

"*A.* This hole was on the west side.

"*Q.* He drove on the west side, so the horse put his foot in that hole?

"*A.* No, sir, you are mistaken; I didn't say that.

"*Q.* Where did he put his foot and get caught?

"*A.* I don't know.

"*Q.* It was at this same plank where there was a hole and it was broken, was it not?

"*A.* I didn't say he put his foot in that hole on the west side of the bridge.

"*Q.* It was that same plank where he got caught?

"*A.* Yes, sir.

"*Q.* There was not anything else that you observed but the hole that he could get caught in?

"*A.* No, sir; I couldn't see anything else.

"*Q.* So that defect, or that hole, at that particular place, was the only thing you noticed on the bridge, and that being the place where the horse made this jump?

"*A.* That is what I saw when looking back.

"*Q.* You didn't notice any other place?

"*A.* No, sir."

Further extracts were read in evidence to the jury from the testimony given on a former trial, in which she stated that the "horse got his foot caught in that hole." And the attorney for the plaintiff also read from the stenographer's minutes of the testimony of the witness, given upon such former trial, to show that the witness stated that she did not see the horse's feet caught, but that she knew he got caught by his giving an awful jerk; that she looked back and saw

the plank; that it was lying over the other one; that it had moved out of position.

After the jury had rendered a general verdict for the plaintiff, defendant entered a motion in arrest of judgment, for the reason that the jury, by their answers to the special questions, found that one of the horses of the deceased stepped into a hole in the bridge, as testified to by Anna Merkle, and that such was the direct cause of the injury, and that no such cause was or is alleged in the plaintiff's declaration.

The motion was overruled, and counsel for defendant insist that such ruling was erroneous, and they further insist that there was a fatal variance between the declaration and the evidence offered to sustain it, viz.:

1. That the declaration alleges that, because the planks were loose, and the stringers uneven, the planks were liable to slip off, turn over, and tip up, and thereby trip horses; that the horses did become entangled in the loose plank, and thereby tripped.

2. That the direct and only evidence upon the subject showed that there was a broken plank, and a hole in consequence thereof; that the off horse stepped into this hole, and then stumbled or jumped, causing the wagon tongue to fall; hence the injury.

The case of *Batterson v. Railway Co.*, 49 Mich. 184 (13 N. W. Rep. 508), is cited in support of the objection here taken. There is no analogy between the two cases. In the *Batterson Case,* this Court held that the intention of the pleader, as appeared from the averments of the declaration, was to complain of defects which existed in the main line of defendant's railroad which caused the injury to the plaintiff, when his proofs showed that the defect which occasioned the injury was not upon the main track, but upon the side track, or switch.

" The testimony fixed the theater of the imputed negligence, and the place of the injury, on an unballasted side track,"—

Where a different measure of duty rested upon the defendant, as regarded its employés, from that which would have been imposed upon it if the scene of the accident had been the main track. *Batterson v. Railway Co.*, 53 Mich. 125 (18 N. W. Rep. 584).

In this case, the theater of the injury is the same, whether the primary cause was occasioned by a hole caused by a piece having been broken out of the plank, which had become warped, and bowed up, or by a hole caused by the horse hitting the plank with his hoof in such manner as to get caught between the planks. In either case, the defect was due to the condition of the planking of the bridge, rendering the same unsafe and unfit for public travel.

The object of a pleading is to apprise the court and opposite party of the pleader's claim. Certainty to a common intent is all that is required in the declaration, and this is attained, in actions of trespass on the case for negligence, when the neglect of duty relied on, and resultant injury, are described with substantial accuracy.

In this case, the declaration was sufficiently specific, and the proofs were not so variant as to the particular defects which caused the injury as to be fatal to a recovery. The testimony introduced by plaintiff, by the mouth of many witnesses, fully sustained the declaration as to the defective condition of the planking upon the bridge. The testimony of Anna Merkle, bearing upon this point, is given above. She says she did not see the horse's foot when it got caught in the bridge. She saw him jerk very hard to get it loose, and looked back, and saw the plank displaced and slipped back across the other plank.

But the objection of variance is disposed of in this case upon well-recognized principles. The testimony, when introduced, was not objected to on the ground that it was not the case alleged in the declaration. On the contrary, the evidence as to the horse being caught in a hole was introduced

by defendant from the stenographer's minutes of the testimony given upon a former trial.    Under such circumstances, the objections raised, ought, after verdict, to be disregarded; or if the variance was substantial, the declaration ought to be treated as amended to meet the proofs made.    Here there was no surprise to the defendant as to what it was called upon to meet.    The variance alleged was more a matter of detail than of substance.    The defendant introduced a large number of witnesses to controvert the evidence that there was any hole in the bridge, or that it was out of repair and, under the principles laid down in *M'Hardy v. Wadsworth*, 8 Mich. 349, and *Stone v. Covell*, 29 Id. 359, the objections taken on the ground of variance must be overruled.

We should notice here the requests of counsel for defendant, based upon the question of variance.    These were requests numbered seven and eight.    They are embodied in the bill of exceptions, but the circuit judge certifies that he has no recollection that such requests were presented to him or brought to his attention.    There appears to be some mistake about these additional requests; and, under the record as it stands, we do not think the counsel for defendant are in a position to predicate error upon the fact that they were not given.

It was held in *Stone v. Covell, supra,* that where testimony was introduced, and the party relying upon variance made no objection on that ground until his request to charge, when it was brought to the attention of the court for the first time, it was too late, and the objection would be deemed waived. Had these requests been brought to the attention of the court, he might have refused them for the reasons stated in *Stone v. Covell.*

It is further insisted that as the jury, in answer to the second special question, found as a fact that one of Mr. Merkle's horses stepped into a hole in the bridge, as testified to by Anna Merkle, and it was the direct cause of the injury, and

this cause not having been alleged in the declaration, the motion in arrest of judgment should have been granted. What we have said covers this point.

Mary Deer, a witness on the part of the plaintiff, added to one of her answers: "It was a very poor, shackly bridge." Defendant's counsel asked that this be stricken out. The court refused. George Rowell, a witness on the part of the defendant, in answer to a question said: "From my personal knowledge the bridge was in good repair." This, on motion of the plaintiff's attorney, was stricken out. To each of these rulings counsel for defendant excepted. Counsel insist that both of these rulings cannot be correct. In this we agree. The first ruling was correct, and the latter erroneous. The error was one, however, which did not prejudice the defendant, we think.

The witness was next asked:

"Q. What did you notice,—what defects, if any? Point them out.

"A. I didn't notice any defects.

"Q. How did you find the plank, as to whether they were sound or otherwise?

"A. As far as I know, they were; I saw no defective plank.

"Q. What holes, if any, did you discover in the bridge; what parts or places?

"A. Nothing but the usual cracks between the planks."

The witness further testified as to what kind of planks were used, their thickness, the way they were fastened, and what and when repairs were made prior to the accident. It thus appeared from his testimony, the weight and credibility of which were for the jury, that the bridge was in good repair. The facts upon which his opinion would have been based were all placed before the jury; and, while his opinion was admissible for such weight as the jury chose to give it, its rejection could not have had a prejudicial effect upon the minds of the jurors. *Chambers v. Hill*, 34 Mich, 523, 525.

The ruling seems not to have been very rigorously adhered to, as the witness Robert Wilcox, introduced and examined on behalf of defendant, when asked as to the condition of the bridge, answered without objection: "Well, I thought it was in good repair;" and again he was asked: "What had you noticed upon these occasions?" *A.* "I thought it was in good shape." Likewise, the witness Milton E. Fisher was asked, by counsel for defendant: "After making those repairs, what condition did you then leave the bridge in?" To which he answered, "In good condition."

Error is assigned upon a question asked the witness Fisher, as follows:

"Don't you remember, when you started off down to fix that bridge, the doctor was there, fixing this boy's hand that got hurt, and didn't Mary say to you: 'You town officers are a nice set of men; you shut the barn-door after the horse has got away; now you will fix the bridge after the man has got hurt?'"

The question was objected to, but the ground of objection was not stated. The witness was permitted to answer and said:

"I don't recollect of hearing of any such thing."

As no reason was assigned for the objection, we cannot say that the court erred in allowing the question. *Young v. Stephens*, 9 Mich. 507; *Snyder v. Willey*, 33 Id. 490; *Ward v. Ward*, 37 Id. 259, and cases cited.

The sixth request made by defendant reads as follows:

"If you find that the overseer of highways, Mr. Fisher, repaired the bridge carefully and properly, and that such repairs were made on or after the twenty-seventh day of June, 1881, and you further find that, between the date of such repairs and the time of the accident, one of the planks became broken, or slipped to one side, thus leaving a hole in the bridge, where the horses stumbled, I charge you, in the absence of testimony bringing home to the proper township officers knowledge of such defect, the plaintiff could not recover, as the defect, under such circumstances, was not of

such long standing, or of that character, that knowledge thereof could be charged against the township."

This instruction was given by the court to the jury, with this addition:

"But this depends upon whether the repairs on the thirtieth of June covered the place where this alleged accident occurred by reason of defects in the bridge."

Counsel for defendant claim that there was certainly evidence tending to show that the bridge had been repaired; that there was also evidence tending to show that this hole was caused by a broken plank; and that the request was, if the jury found that, between the date of the repairs and the time of the accident, the plank became broken, or slipped to one side; and that, under the addition made by the court, unless the jury could say that the particular plank which broke had been put in, or something done to it by the overseer on the thirtieth of June, the township would be liable, although on that date it appeared to be sound, properly secured, and safe.

We do not draw the same inference from the addition made by the court that the learned counsel do. Under the testimony in the case, it was a disputed question whether, for a long time prior to the accident, the bridge had been out of repair at the place where the accident occurred; namely, the loose and warped condition of the planks, and the hole caused by one of the planks being broken. Defendant's witness Fisher had testified that he repaired the bridge between the twentieth of June and the first of July; that he traveled across the bridge in the forenoon of the day of the accident, and the bridge was then in good repair; that, in the afternoon after the accident, he examined the bridge, and found the ribbon broken a short distance from the south end, and found a plank had been turned over right where he had repaired the plank that was broken off by replacing it with a new plank; that the plank was not broken, but simply

68 MICH—10.

warped up.   We think it was proper for the court to direct
the attention of the jury to the precise place in.controversy,
and to the disputed question whether,it had been repaired.

One further objection remains to be noticed.   The deceased
left a last will and testament, which, upon petition of Mrs.
Merkle, was admitted to probate September 12, 1881.   The
executor named therein qualified, the estate was administered
and closed, and the executor discharged.   It is admitted that
Mrs. Merkle requested the executor to commence suit against
the township, and he refused.

After the executor was discharged, Mrs. Merkle, on Novem-
ber 3, 1883, filed a petition in the probate court, setting forth
that George Merkle had died, leaving a last will and testa-
ment; that he was possessed of real and personal estate, etc.;
and praying that administration be granted to her.   Due
notice of the application was given, and on the third day of
December, 1883, letters were issued to said Augusta Merkle,
with the will annexed, under which she has done nothing
but to commence and prosecute this suit.   It is claimed that
the probate court had no jurisdiction to make this appoint-
ment.

The objection is without force.   The liability created by
the statute in cases of this kind is a chose in action which is
assets belonging to the personal representative ; and if the
executor named in a will refuses to prosecute, or, in other
words, refuses to enforce collection, and reduce the assets to
a chose in possession, for the purpose of distribution under
the statute, and proceeds and closes his administration of the
estate, and procures his discharge, disregarding the rights of
the widow and children of the deceased, another person may
be appointed to complete the administration of the estate so
left unadministered, under How. Stat. § 5843.   It would be
a sad failure of justice if the executor or administrator could
defeat the right of the widow and children, and deprive them

of the rights secured to them by the statute, by refusing to prosecute the suit and resigning his office.

The judgment is affirmed.

The other Justices concurred.