WALSH v. LAKE SHORE & MICHIGAN SOUTHERN RAILWAY
CO.

1. APPEAL AND ERROR—NEW TRIAL—WEIGHT OF EVIDENCE.

On review of the trial court's refusal to grant a new trial, in an action for the unlawful death of one of the members of a switching crew, a verdict not clearly against the overwhelming weight of the evidence will not be disturbed by the Supreme Court.

2. MASTER AND SERVANT—WORKMEN'S COMPENSATION—EMPLOYER'S LIABILITY—NEGLIGENCE.

Under the Federal act relating to employer's liability to employees for negligence, the defendant railway company was liable to the widow and daughter of decedent for negligence of defendant's conductor in charge of the switching crew whose duty it was to close one switch when it was the purpose of the engineer of the crew to place cars upon another adjacent switch, when, by omitting to close it the conductor caused the cars and train to pass upon the switch where decedent was working, and the train struck and killed him.

3. CONTRIBUTORY NEGLIGENCE—FEDERAL STATUTE.

Upon the subject of contributory negligence the trial court instructed the jury that they should determine whether or not decedent was chargeable with contributory negligence; that if he was guilty of any negligence contributing to or causing the injury, defining the same as a want of ordinary care, plaintiff was entitled to recover, but that his damages should be diminished by the jury in proportion to the amount of negligence of such employee; that if the plaintiff was entitled to recover and if the jury did not find that he was guilty of contributory negligence he should be awarded full damages and that otherwise they should deduct from the amount of damages suffered, such amount as they might find to have resulted by reason of decedent's own neglect, *held*, to sufficiently submit the issue of contributory negligence to the jury under Act of April 22, 1908, 35 U. S. Stat. 65 (U. S. Comp. Stat. 1913, § 8657 *et seq.*).

185 Mich.—12.

4. APPEAL AND ERROR—SAVING QUESTIONS FOR REVIEW—BRIEFS.
    A question not raised in the trial court will not be con-
    sidered by the Supreme Court on error and assignments
    of error not discussed in the original brief filed in the
    Supreme Court will be considered to have been waived.

Error to Kent; Brown, J. Submitted January 22,
1915. (Docket No. 73.) Decided March 18, 1915.

Case by Ruth C. Walsh, as administratrix of the
estate of Edward M. Walsh, deceased, against the
Lake Shore & Michigan Southern Railway Company
for the unlawful killing of plaintiff's intestate. Judg-
ment for plaintiff. Defendant brings error. Affirmed.

*Clapperton, Owen & Hatten* (*Samuel H. Kelley*, of
counsel), for appellant.
*Hatch, McAllister & Raymond*, for appellee.

This action is brought under the Federal employ-
ers' liability law of April 22, 1908, 35 U. S. Stat. 65
(U. S. Comp. Stat. 1913, §§ 8657-8665), by the ad-
ministratrix of the estate of Edward M. Walsh,
who met his death on the night of February 10, 1913,
while engaged in switching cars on the lines of the
defendant railway company in the city of Chicago,
Ill. It is not denied that plaintiff's intestate was en-
gaged in switching a train of interstate commerce
cars, and it is admitted that the jury should, under
the Federal statute, apportion the damages between
the widow and daughter of the deceased. The trial
resulted in a verdict of $4,500 in favor of the plaintiff
and $2,500 in favor of her child.

On the night of the injury, Walsh was one of a
switching crew which was composed of Engineer
King, Conductor Jones, Head Switchman Wynn, Fire-
man St. Pierre, and Walsh.

The claims of the parties hereto with reference to
this controversy are clearly stated in the charge of
the court as follows:

"The plaintiff in this case claims that on the night of February 11, 1913 (that is, it would be the morning of February 11th, or about 1:25 a. m., February 11th), her husband, Edward M. Walsh, was in the employ of the defendant railroad company, and that he was engaged in performing the duties of what is known as a fieldman with a switching crew that was engaged in switching interstate commerce cars on what is known as switch track No. 4 and switch track No. 5, at Park Manor switching yards, in the city of Chicago.

"The plaintiff claims that in the performance of his duties he was required to open the knuckles on the cars that were sent in from the lead tracks onto switch tracks 4 and 5, so that, when the cars came together, an automatic coupling would close, and thereby couple the cars together.

"It is claimed on the part of the plaintiff that about 1:25 o'clock in the nighttime (that is, 1:25 o'clock in the morning) of February 11, 1913, the switching crew, who were operating under the direction of Conductor Jones, pulled a string of about 19 cars off of switch No. 5 for the purpose of putting part of the cars in on No. 4 and part of the cars back on No. 5, and that in performing this operation it was necessary for the train to be pulled down on the lead track south of switch 4, and when cars were to be shunted in on side track 4 the switch was to be turned, and when the cars were to be on No. 5 the switch was to be closed on No. 4; the only switch being opened and closed in the operation of the movement of these cars being switch No. 4.

"It is claimed on the part of the plaintiff that the first 19 cars were pulled down past 4 and one car was thrown in on switch 4, then two were thrown back on 5, and then one on 4, and the next seven cars were to be thrown onto switch track 5.

"It is claimed by the plaintiff that Conductor Jones was the man who directed the movement of the train, and was turning the switch during this operation, and that, at the time the train pulled back in No. 4 to throw these seven cars onto No. 5, he signaled the train to come ahead without throwing the switch, and while the switch showed green, and that it was set for No. 4, and that the train went wrong, and that

these seven cars were thrown in on switch track 4 with great force, by mistake, and that Mr. Walsh, who was performing his duties in the field of this switching yard, such as opening knuckles on cars on switch track 4 and looking after cars at the time, was then and there instantly killed by these cars coming in on track 4 through this mistake.

"The plaintiff claims that Walsh's duties were out in the field, and that he was working at this time out in the field and away from the lead, and away from the switches that communicated these switch tracks with the lead, and that he was not at the switches, and that Conductor Jones was at the switches, and that he turned the switches and gave the signals, had control of the train and immediate operation of the switches. That is the claim of the plaintiff.

"The plaintiff claims that Walsh was proceeding back into the field, either upon or along by the side of switch track No. 4, knowing that Jones was at the switch and had control of operating the switch, and that his signals were necessary in order to move the train, and that Walsh, knowing that Jones was at the switch, relied upon that and walked back or very near to switch track No. 4, and when he was back in the field—I do not mean to say the plaintiff claims that Walsh walked back from the switch, but he was back in the field on switch track No. 4, knowing that Jones was at the point of switch No. 4, and that while he was back there attending to his duties (such as opening the knuckles on the freight cars that had been shunted in, watching the cars, and observing the spaces and distances from the cars to the switch, how many cars should be put in there), in and about the duties of his work, relying upon Jones to take cars of the switch at No. 4, while in that condition and position these cars came in there without his knowing anything about them, silently and without warning or notice, and ran upon him and killed him, without any negligence on his part, the negligence being entirely the negligence of Jones, the conductor, who failed to throw the switch, and who gave the signal for the cars to come ahead before the switch had been thrown, whose duty it was, the plaintiff claims, to refrain from giving the signal until the switch had been properly placed.

"On the other hand, the defendant claims (that is, the railroad company) that Walsh was a member of this switching crew, as well as Jones and Wynn; that Walsh was the fieldman, Wynn was the headman on the train, next to the engine in switching, and Jones was the conductor and the foreman.

"The defendant claims that Jones took a position alongside of the lead, on the easterly side of the lead, several car lengths southerly from switch No. 4, where he could signal the engineer, and that Walsh was at switch No. 4; that Walsh was turning the switch, and, when Walsh gave Jones the signal that the switch was right, Jones communicated it to the engineer, and the engineer then took Jones' signal and operated the train.

"The defendant claims that Jones was not near the switch, did not operate it for that cut-out or switching of the seven cars, and had not operated it since supper time that night, but that Walsh had stood there by switch No. 4 and operated switch No. 4.

"The defendant claims on this particular cut-off of seven cars in question Jones was several car lengths distant, southerly, at a position where he stood to receive Walsh's signals from the switch, and that Walsh was at the switch and gave the signal for the train to come back to cut off seven cars on switch 5, and that Walsh failed to turn switch No. 4, and as he walked back in the field, through his own mistake, he came upon the track or near the track, and was run over and upon by the detached seven cars which were intended for 5, and through Walsh's mistake went in on 4; and the defendant claims that for that reason the accident, so far as anybody but Walsh is concerned, was wholly unavoidable, an inevitable accident, one that was attributable directly to his own mistake, and that Jones gave the signal that Walsh gave and the engineer relied upon the signal. The engineer could not do anything after the cars had been detached, neither could Jones, and they did not notice it until they had gone in the wrong switch; and for that reason, the defendant says, Jones and the engineer are entirely unblamable, that Walsh was entirely to blame, and it was his own oversight and negligence, and that therefore they are not in any manner to be held liable in this suit."

KUHN, J. (*after stating the facts*).  There are 29 assignments of error, and the one which is chiefly argued, and upon which principal reliance seems to be based for a reversal of this case, is that the trial judge erred in denying defendant's motion for a new trial on the ground that the verdict is contrary to the weight of the evidence produced on the trial of said cause, and at variance with the great preponderance of the evidence.  A consideration of this assignment of error has necessitated a careful study of the record, and it resolves itself finally into the question whether the testimony of the witness Wynn, who was a member of the crew on the night in question, should be disregarded, and the testimony of Jones, the conductor whose negligence, it is the plaintiff's claim, was the direct cause of the injury, should be accepted as a truthful statement of the facts surrounding the accident.

We think that the testimony of the members of the crew clearly establishes that on the night in question Walsh was engaged in performing the duties of what was known as a "fieldman."  Jones, the conductor, testified with reference to these duties as follows:

"*Q.* Was Mr. Walsh performing any duties that night, the duties known as fieldman?

"*A.* Yes, sir.

"*Q.* What are the duties of a fieldman?

"*A.* Throwing the switches and coupling up the cars and setting brakes on cars.

"*Q.* Was he performing those duties that night?

"*A.* All with the exception of putting the brakes on at that time."

The engineer, King, said:

"He was acting as fieldman at the time.  The duties of fieldman are throwing switches for different cars to go in and opening knuckles so that cars will couple. That is done so that they will couple when they come together.  A knuckle can be opened so that, when a car is swung against it, they will close, and the cars

will be coupled without a man being present at the coupling operation, and that is what I mean by opening knuckles; that is, throwing up the lever of the automatic coupler, so that, when the next car bumps into it, the coupling will close, and that was a part of Mr. Walsh's duties. * * * "

Nelson, yardmaster, testified:

"On that night of the accident, he was performing the duty of fieldman. He was performing these duties under the direction of Conductor Jones. * * * The conductor and the fieldman always, as a rule, go together. They work together, and are generally together. The fieldman is ahead of the conductor and opens the knuckles, if there is any openings; that is part of his duties, to open knuckles, and if it becomes necessary to couple up cars, that is part of his duties."

Wynn, head switchman, testified that Mr. Walsh was not out on the lead at all; that he was in the field when he was killed; that he had talked with him in there as the train pulled back off track No. 4 just before the accident; and that Jones was at switch 4 when he gave the fatal signal.

It was the claim of Conductor Jones (who was acting that night for the first time as conductor of *that* crew) that he turned no switches during these operations; that he received the signals from Walsh to come back or go ahead, and transmitted the signals to the engineer. It is the defendant's claim that the testimony of Jones is corroborated by the physical fact that, where these switching operations took place, there was a curve in the track, and that it would have been impossible for the engineer to see Jones, because of the curve, if he had been at switch No. 4, as claimed by witness Wynn. The engineer, however, upon the witness stand, stated that, although he had testified before the coroner, his attention was never called to the question whether there was a curve in that track until he became a witness upon the trial in the lower court. An examination of the plat which

was offered in evidence by the defendant further discloses that the curve shown is very slight and was not such as to have obstructed the engineer's view to such an extent that he could not have seen up the lead track past switches 4 and 5.

A reading of this record shows that there are discrepancies in the testimony of witnesses for both plaintiff and defendant, and these discrepancies and apparent contradictions need not be pointed out here. The jury, who heard this testimony, and who saw the witnesses upon the witness stand, were in a better position to determine what testimony should be discredited than we are. The trial judge also had the advantage of seeing these witnesses on the stand, and in denying the motion for a new trial, alleging, among other reasons, that the verdict was against the weight of the evidence, had the benefit of this in making his determination, and had an excellent opportunity to judge of their truthfulness.

In the recent case of *Druck* v. *Lime Co.*, 177 Mich. 364 (143 N. W. 59), this court, speaking through Mr. Justice STONE, said:

"The rule is well settled that this court will only reverse a case upon the question of the weight of the evidence when the verdict is against the overwhelming weight of the evidence. The verdict must be clearly against the great weight of the evidence to require this court to overrule the decision of the circuit judge in refusing a new trial. *Gardiner* v. *Courtright*, 165 Mich. 54, 62 (130 N. W. 322); *Fike* v. *Railroad Co.*, 174 Mich. 167 (140 N. W. 592). We cannot say that the verdict in this case was against the overwhelming weight of the evidence, in .the light of the record."

This rule has been repeatedly announced by the court, and we therefore conclude in the instant case that it cannot be said that the circuit judge abused his discretion in refusing a new trial on the ground

that the verdict was against the weight of the evidence.

It is also contended by appellant that, even if the testimony of Wynn is to be believed, the act of Jones in omitting to turn the switch was not a negligent act for which an action would lie, for the reason that an injury to Walsh could not have been reasonably anticipated as a result of the act.

The facts in the recent case of *Evans* v. *Railway Co.*, 181 Mich. 413 (148 N. W. 490), are in many respects very similar, indeed, to the facts in the case now before us. In that case, the action was brought under the Federal statute by a car repairer who was working on a track which was attached to a lead track, and cars had to be shunted in and off this lead track by the opening and closing of switches; and, while he was working on one of these tracks, the switch was opened and a car thrown in on that track, and he received injuries, from which he died the day after. The only key that would open the switch was found in the possession of the assistant foreman, and it was held that the act of the assistant foreman in opening the switch and throwing the car in on this track, where the deceased was working, was an act of negligence, for which the defendant was liable. We can see no difference in principle between that case and the case at bar. Mr. Justice MOORE, speaking for the court in that case, said:

"The respective rights of employers and employed under the Federal statute involved here, and its various amendments, have received the careful attention of the Federal courts, and full discussion may be found in *Second Employers' Liability Cases*, 223 U. S. 1 [32 Sup. Ct. 169, 38 L. R. A. (N. S.) 44]; *Michigan Central R. Co.* v. *Vreeland*, 227 U. S. 59 [33 Sup. Ct. 192, Am. & Eng. Ann. Cas. 1914C, 176]; *St. Louis, etc., R. Co.* v. *Hesterly*, 228 U. S. 702 [33 Sup. Ct. 703]; *Central R. Co. of New Jersey* v. *Young*, 200 Fed. 359 [118 C. C. A. 465]; *Grand Trunk West-*

*ern R. Co.* v. *Lindsay,* 201 Fed. 836 [120 C. C. A. 166] ; *Louisville, etc., R. Co.* v. *Wene,* 202 Fed. 887 [121 C. C. A. 245] ; *Pennsylvania R. Co.* v. *Goughnour,* 208 Fed. 961 [126 C. C. A. 39].

"Under the principles of law stated in these cases, especially the last two, we think it cannot be said, as a matter of law, that there was no negligence shown on the part of Mr. Seeburger."

Under plaintiff's theory of the case, it was the duty of Walsh, who was working in the field, to open the knuckles on the cars and keep them from drifting back on the lead; and if, through the carelessness and dereliction of Jones, switch No. 4 was not turned, and the cars were shunted in on that track, and as a result Walsh met his death, we cannot say, as a matter of law, that such negligence of Jones was not the proximate cause of the injury. The crucial question in this case seems to be: Who failed to turn switch No. 4? And upon this record that became a question of fact for the jury.

With reference to the contributory negligence of Walsh, the trial court charged the jury as follows:

"As I have already intimated, if you find that defendant is guilty of negligence, as I have explained, then you will determine whether or not the plaintiff's decedent (that is, Edward M. Walsh) is guilty of contributory negligence (that is, whether plaintiff's decedent is guilty of any negligence that contributed to his injury). If he was guilty of any negligence that contributed or helped to cause the injury, that is what is known as contributory negligence, and contributory negligence is a want of ordinary care on the part of the person injured by the actionable negligence of another concurring with the negligence and contributing to the injury as a producing cause.

"The act under which this action is brought, as I have already read to you, says that the fact that the employee may have been guilty of contributory negligence shall not bar his recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.

"The act under which this action is brought says that the fact that the employee may have been guilty of contributory negligence shall not bar his recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.

"If you find that the plaintiff is entitled to recover, and that the decedent was not guilty of contributory negligence which contributed in any degree to his injury, then the plaintiff would be entitled to recover full damages (that is, all damages resulting from the negligent acts of the defendant).

"If you find that the decedent, Edward M. Walsh, was guilty of contributory negligence, then the plaintiff will not be entitled to full damages, but you will have to deduct from the plaintiff's full damages such damages as you may find have been suffered by reason of decedent's own negligence (that is, if you find that the plaintiff is entitled to damages, you will have to estimate first how much damages the plaintiff has suffered, and then, if you find that the decedent was guilty of some negligence, you will subtract from the entire damages such proportion as you find was caused on account of the decedent's own negligence)."

We are of the opinion that this properly submitted the question of plaintiff's decedent's contributory negligence to the jury, and that there was no error in this regard.

After the argument of the case in this court, it was suggested to counsel that the court would be pleased to hear from them as to whether it can be said that the negligence of a fellow-servant is one of the risks that the employee assumes, in view of the language of the United States Supreme Court in the case of *Southern R. Co.* v. *Crockett,* reported in 234 U. S. 725, 34 Sup. Ct. 897, that:

"By the employers' liability act the defense of assumption of risk remains as at common law, saving in the cases mentioned in section 4; that is to say, 'any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of the employee.'"

Counsel for appellee, we think very properly, called our attention to the fact that this question here suggested was not brought to the attention of the court below in any way, was not considered or ruled upon by that court; that no assignments of error are before us with relation to it, nor was it discussed by counsel in their original briefs; and that therefore the question is not here open for consideration or review. Our attention is challenged to the case of *Maclean* v. *Scripps*, 52 Mich. 214 (17 N. W. 815), in which Mr. Justice CAMPBELL, in referring to the right of this court to consider questions not raised by assignments of error and exceptions, said:

"We have no right, under bill of exceptions, to review anything but such action of the court itself as is excepted to. The power of this court to review the action in circuit courts on trials is one derived entirely from the statute and common-law practice on bills of exceptions.. The law has left all things not legitimately belonging to exceptions to be managed by the circuit courts in furtherance of their own authority. We have no more power to review what they have not passed upon than to exercise original jurisdiction in civil matters. It would be going entirely beyond our authority to notice what has not been ruled on and excepted to below."

See, also, *Wilkinson* v. *Earl*, 39 Mich. 626; *Benson* v. *Bawden*, 149 Mich. 584 (113 N. W. 20, 13 L. R. A. [N. S.] 721); *Marshall* v. *Accident Ass'n*, 151 Mich. 245 (114 N. W. 1028); *Conger* v. *Hall*, 158 Mich. 447 (122 N. W. 1073).

For this reason, therefore, we must decline to pass upon the question above suggested.

We have examined such other assignments of error as are discussed by counsel in their briefs, and those not so discussed must be deemed to have been waived. Supreme Court Rule No. 40; *People* v. *Cole*, 139 Mich. 312 (102 N. W. 856); *Nissly* v. *Railway Co.*, 168 Mich. 676, at page 682 (131 N. W.

145, 135 N. W. 268, Am. & Eng. Ann. Cas. 1913C, 719). Those that were commented upon in the briefs and are not herein specifically referred to we deem without merit.

We find no error in the record, and judgment is therefore affirmed.

BROOKE, C. J., and MCALVAY, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred. MOORE, J., did not sit.